## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MELISSA BOGLE,<br>    *Plaintiff*,<br><br>      v.<br><br>CONNECTICUT DEPARTMENT OF<br>MENTAL HEALTH AND ADDICTION<br>SERVICES and LAKISHA HYATT,<br>    *Defendants.* | No. 3:23-cv-323 (VAB) |

### RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Melissa Bogle ("Plaintiff" or "Ms. Bogle") has sued the Connecticut Department of

Mental Health and Addiction Services ("DMHAS") and Lakisha Hyatt ("Mr. Hyatt")

(collectively, the "Defendants"), alleging violations of 42 U.S.C. § 2000e, et seq. ("Title VII"),

and 42 U.S.C. § 1983. Am. Compl., ECF No. 17 (Apr. 12, 2023) ("Am. Compl."); Ruling and

Order on Motion to Dismiss, ECF No. 39 (Mar. 22, 2024).

The Defendants have filed a motion for summary judgment. Mot. for Summ. J., ECF No.

59 (Nov. 12, 2024) ("Mot.").

For the following reasons, the Defendants' motion for summary judgment is **GRANTED**

in part, and **DENIED** in part**.**

The hostile work environment claim is dismissed, but the Title VII disparate impact claim

against DMHAS, and the Section 1983 claim against Ms. Hyatt will proceed to trial.

I.     **FACTUAL AND PROCEDURAL BACKGROUND**

   A.  **Factual Background[1]**

Melissa Bogle, hired by DHMAS at Connecticut Valley Hospital as a Mental Health Assistant 1 ("MHA-1") on October 28, 2005, identifies as African American. Defs.' SMF ¶ 1-2.

Collaborative Safety Strategy ("CSS") is DMHAS's emergency response training provided to employees who are involved in direct care or may come into contact with patients. *Id.* ¶ 6. A mental health assistant must deal with patients who have difficulty processing and may become aggressive or assaultive. *Id.* ¶ 7. CSS training teaches mental health assistants how to de-escalate hostile or aggressive patients and perform restraints and takedowns. *Id.* ¶ 8. Techniques such as de-escalation, physical restraints, or takedowns may be used when patients exhibit hostile or aggressive behavior, as they are inherent in the job. *Id.* ¶ 9. CSS crisis response training covers physical restraints, takedowns, and de-escalation techniques. *Id.* ¶ 10.

CSS training prohibits solo patient takedowns, and restraints must be performed correctly with the involvement of more than one employee to execute a takedown. *Id.* ¶ 11. Indeed, DMHAS Work Rule 19 prohibits "physical violence, verbal abuse, inappropriate or indecent conduct and behavior that endangers the safety and welfare of persons or property." Defs.' SMF ¶ 44. DMHAS Commissioner's Policy #29 prohibits "abuse neglect or exploitation of clients or Patients of DMHAS operated facilities." *Id.* ¶ 45. DMHAS Commissioner's Policy Statement

---

[1] Unless noted otherwise, the following factual statements are taken from portions of the Defendants' Statement of Material Facts that Ms. Bogle has admitted to be true, *see* Pl.'s SOF at 1–8, or from Ms. Bogle's Statement of Material Facts. For facts to which Ms. Bogle states a proper objection, the Court will cite to Ms. Bogle's Statement of Material Facts, and the Defendant's Reply if necessary to resolve whether there are adequate grounds for Ms. Bogle's objection such that there remains a disputed issue of fact.

Chapter 3.1 prohibits "offensive or abusive conduct toward the public, co-workers, or inmates, patients or clients of state institutions or facilities." *Id.* ¶ 46.

Notwithstanding the Collaborative Safety Strategy ("CSS") training, Ms. Bogle testified that, when one is alone and attacked by two patients, the trainers instructed mental health assistants to do whatever is necessary to get out of the situation safely. Pl.'s SOF ¶ 14. The policy at Connecticut Valley Hospital ("CVH") was to have one mental health worker for every four patients. *Id.* ¶ 15.

Mental health employees are given a panic alarm button to summon help in an emergency situation. Defs.' SMF ¶ 16. Panic alarm buttons are also placed in the nursing station. *Id.* ¶ 17. The panic alarm button alerts everyone in the building of an emergency, and notifies them, if an employee has an emergency involving a patient. *Id.* ¶ 18. Ms. Bogle received CSS training when hired by DMHAS, *id.* ¶ 19, and testified that she received this training annually. *Id.* ¶ 20.

On August 8, 2020, Ms. Bogle had an incident, had a panic alarm button available to her, *id.* ¶ 21, but she did not activate it. *Id.* ¶ 22. Ms. Bogle claims not to have had the time to do so. Pl.'s SOF ¶ 4.

At that time, the Battell 4 Unit, where Ms. Bogle worked, had both male and female patients, Defs.' SMF ¶¶ 24-25, and was typically staffed with two nurses and five mental health assistants for day shifts. *Id.* ¶ 26. Staff members performed census rounds alone and were not required to be paired with another staff member. *Id.* ¶ 29.

On this day, while performing census rounds alone in the male dorm of Battell 4, which requires walking throughout the units, observing the patients, and ensuring each patient is safe and accounted for, *id.* ¶ 30, two psychiatric patients (one male and one female) became physically violent with Ms. Bogle. *Id.* ¶ 31; Pl.'s SOF ¶ 13.

3

Ms. Bogle entered the male dorm on Battelle 4 South to complete the census. She checked each patient's room as she moved through the dorm. *Id.* ¶ 33. While walking towards the end of the male dorm, she looked up from writing on her board to see a female patient standing in front of her in the male dorm. *Id.* ¶ 34. Ms. Bogle told the female patient to leave the male dorm. *Id.* ¶ 35. After Ms. Bogle said this to the patient, the female patient physically attacked Ms. Bogle. *Id.* ¶ 37. During the attack, Ms. Bogle went from one side of the dorm to another, *id.* ¶ 38, and that the male patient grabbed her from behind. *Id.* ¶ 40.

The incident both scared and terrified Ms. Bogle. Pl.'s SOF ¶ 5. During the attack, both Ms. Bogle and the female patient fell to the floor, and she heard one of the male patients yell, "they're attacking Melissa!" One of the other nurses then came back to the nurses' station and used the panic alarm to summon help. *Id.* ¶ 8. As Ms. Bogle got up and walked to the nurses' station, visibly shaken and trembling, the female patient followed her and began banging on the glass surrounding the station, yelling and shouting at her. *Id.* ¶ 9. Ms. Bogle's supervisor instructed her to go to Urgent Care, which she did. *Id.* ¶ 10. As a result of the attack, Ms. Bogle allegedly sustained injuries to both her neck and back. *Id.* ¶ 11.

On October 15, 2020, Ms. Bogle later completed a witness statement detailing her account of this August 8, 2020 incident. Defs.' SMF ¶ 32.

Steve Beaupre, the Director of Nursing, discovered the incident involving the plaintiff while reviewing video footage as part of an investigation into allegations of patient abuse that occurred on Battell 4, involving a DMHAS staff member. *Id.* ¶ 48. Steve Beaupre is a mandatory reporter. *Id.* ¶ 49. As part of his own investigation, Labor Relations Specialist Michael Wood reviewed the MHAS-20 report, the incident video, witness statements, and took a statement from Ms. Bogle. *Id.* ¶ 54. Wood concluded that Ms. Bogle engaged in prohibited contact with a patient

and her actions violated DMHAS' Work Rule 19, Commissioner's Policy State #29, and

DMHAS Commissioner's Policy Statement Chapter 3.1, Neglect of Duty and Engagement in any

activity which is detrimental to the best interest of the agency or the state. *Id.* ¶ 55. Michael

Wood agreed that the female patient initiated contact with Ms. Bogle. *Id.* ¶ 58. Michael Wood,

allegedly consistently indicated throughout his investigation of the August 8, 2020 incident that

mental health assistants are permitted to either "Flee, Freeze or Fight" under CVH policy. Pl.'s

SOF ¶ 21. During Ms. Bogle's initial investigatory meeting with Michael Wood, he allegedly

falsely accused her of being the aggressor in the attack. *Id.* ¶ 12.

Steve Beaupre presented Wood's Investigation Summary report with a recommendation

for dismissal to the Chief Executive Officer, Lakisha Hyatt, for her review and approval. Defs.'

SMF ¶ 63. The recommendation was then presented to the Discipline Review Committee. *Id.* ¶

65. The Discipline Review Committee reviews all cases of suspension or greater. *Id.* ¶ 66.

Ms. Bogle had been accused of pulling the female patient to the floor. Def.'s SMF ¶ 17.

But Ms. Bogle claims that, under her training, she could physically attempt to extricate herself

from an assaultive patient by using the force necessary to get out of a situation safely. *Id.* ¶ 18. In

her view, her actions, based on the video of this incident were defensive in nature, and not

intended to be assaultive of either patient. *Id.* ¶ 19.

On October 7, 2019, several months before Ms. Bogle's August 8, 2020 incident, a white

co-worker, Erik Seitz, received a fifteen-day suspension, and another African-American co-

worker, Anton Butler, received a thirty-day suspension for violating DMHAS Work Rule #19

and Commissioner Policy Statement #29, and then returned to work after their suspensions. *Id.* ¶

81.

Mr. Seitz had blocked a patient from trying to leave, and his suspension related to his communication with that patient. *Id.* ¶ 82. Mr. Butler had knocked the shoe out of a patient's hand, and also blocked the same patient from leaving the area. *Id.* ¶ 83.

In another incident, another white co-worker, Steven Petrucci, had been accused of physically and verbally abusing a patient on separate occasions, but he was not terminated. *Id.* ¶ 84. Ms. Bogle claims that, despite Mr. Petrucci having been accused of patient abuse, he nevertheless returned to work after an investigation. *Id.* ¶ 85. Indeed, Petrucci faced three additional misconduct prior allegations, but none were substantiated through investigations. *Id.* ¶ 88. Ms. Bogle claims that Mr. Petrucci's race played a role in his receiving lesser discipline than her because "the patient, I believe, was injured, and he was investigated. During his investigation, his working history was taken into account, and he returned to work on the unit." *Id.* ¶ 86.

Another white co-worker, Jason DeMarco, also allegedly injured a patient, and he was not permanently terminated until he was involved in another incident. Pl.'s SOF ¶ 27. But an investigation substantiated that Jason DeMarco committed patient abuse, and he was terminated following the investigation. He appealed the termination through the State Office of Labor Relations and received his job back under a stipulation agreement. Following a separate incident for involvement in patient abuse, during the investigation into the patient abuse at DMHAS's Whiting facility, he was subsequently fired. Defs.' SMF ¶ 91.

Ms. Bogle claims not to have received a fair investigation, unlike her white comparators. *Id.* ¶ 95. She also claims that her work environment was unsafe and hostile, *see Id.* ¶¶ 97–103 (citing Ms. Bogle's deposition) and that in terminating her, a lack of consideration was given to her many years of service. Pl.'s SOF ¶ 30. Ms. Hyatt denies her allegations. Defs.' SMF ¶ 104.

**B.  Procedural History**

On March 9, 2023, Ms. Bogle filed her Complaint. Compl., ECF No. 1.

On April 12, 2023, Ms. Bogle filed her Amended Complaint against DMHAS, Ms. Hyatt,

and the Chief Executive Officer of Connecticut Valley Hospital alleging violations of Title VII,

42 U.S.C. §§ 1981 and 1983, and Conn. Gen. Stat. § 46a-60(b)(1) ("Connecticut Fair

Employment Practices Act" or "CFEPA"). Am. Compl.

On May 22, 2023, the Defendants filed their motion to dismiss the Amended Complaint.

Mot. to Dismiss, ECF No. 26.

On March 22, 2024, the Court granted in part the Defendants' motion to dismiss,

allowing Ms. Bogle to proceed on her Title VII claim against DMHAS for hostile work

environment, and her Section 1983 claim against Ms. Hyatt. Order, ECF No. 39.

On April 5, 2025, DMHAS filed its Answer to Ms. Bogle's Amended Complaint.

Answer, ECF No. 42.

On that same day, Ms. Hyatt filed her Answer to Ms. Bogle's Amended Complaint.

Answer, ECF No. 43.

On November 12, 2024, the Defendants filed a motion for summary judgment, Mot., their

memorandum in support of their motion for summary judgment, Mem. in Support of Mot. for

Summ. J., ECF No. 59-2 ("Mem."), and their Rule 56(a)(1) Statement of Undisputed Material

Facts, ECF No. 59-3 ("Defs.' SMF").

On January 10, 2025, Ms. Bogle filed her memorandum in opposition to the Defendants'

motion for summary judgment, Mem. in Opp'n to Defs. Mot. for Summ. J., ECF No. 60-1

("Opp'n"), and her Rule 56(a)(2) Statement of Facts, ECF No. 61 ("Pl.'s SOF").

On February 7, 2025, the Defendants filed their response to Ms. Bogle's 56(a)(2) statement of facts and reply to Ms. Bogle's opposition to the Defendants' motion for summary judgment. Defs.' Resp. to Pl.'s SOF and Reply to Pl.'s Opp'n to Defs.' Mot. for Summ. J., ECF No. 68 ("Reply").

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by

documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967) and *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III.    DISCUSSION

The Defendants argue that summary judgment should be granted against (1) Ms. Bogle's disparate treatment claims against DMHAS, (2) Ms. Bogle's hostile work environment claim against DMHAS, and (3) Ms. Bogle's Section 1983 claim against Ms. Hyatt.

The Court will address each claim in turn.

### A. The Disparate Treatment Claim Against DMHAS

Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a). "In discrimination cases . . . if the claim is based primarily on circumstantial evidence, [the Plaintiff must meet] the shifting evidentiary burdens imposed under the framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 584 (2007) (Stevens, J., dissenting). "At the first stage [of the *McDonnell Douglas* framework], the plaintiff bears the burden of establishing a 'prima facie' case [of discrimination] . . . .'Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee.'" *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d. Cir. 2012) (citations omitted).

To establish a prima facie case of disparate treatment for employment termination, "a plaintiff must show that (1) [they are] a member of a protected class; (2) [they were] qualified for the position [they] held; (3) [they] suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010) (citation omitted).

To make a showing of disparate treatment as part of a prima facie case, a plaintiff must show that she is "similarly situated in all material respects to the individuals with whom [she] seeks to compare [herself]." *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). "What constitutes all material respects ... varies," but a court must evaluate "(1) whether the plaintiff and those [s]he maintains were similarly situated were subject to the same workplace standards

and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (internal quotation marks omitted).  While the comparator's situation need not be functionally identical to that of the plaintiff, "[t]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Ruiz*, 609 F.3d at 493–94. Although the question of whether comparators are similarly situated is typically a question of fact for the jury, a court may "properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assocs. v. Inc. Vill. Of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001).

In cases involving allegations of disparate treatment in workplace disciplinary proceedings, a comparator's underlying misconduct must be substantially similar to that of the plaintiff in all material respects—although they need not be identical. *See Radwan v. Manuel*, 55 F.4th 101, 138 (2d Cir. 2022) ("[In the Title IX context,] although a comparator must be similarly situated to [the plaintiff] in material respects . . . they need not be *identically* situated. Instead, the similarly situated requirement can be met if the plaintiff and the comparator were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." (internal quotation marks and citations omitted) (emphasis in original)); *see, e.g.*, *Brown v. City of Syracuse*, 673 F.3d 141, 151 (2d Cir. 2012) (finding in dicta that a plaintiff making Title VII and Section 1983 equal protection claim needed to point to comparators of other races who were not suspended despite also being at "the center of a missing persons investigation" and exhibiting "behavior comparable to his" in that context); *Ruiz*, 609 F.3d at 495 (explaining that none of plaintiff's comparators were similarly situated partially because none of them "were accused of sexual harassment, sexual abuse and rape" like plaintiff).

If the plaintiff satisfies her burden of establishing a prima facie case, "the burden shifts to the defendant to articulate 'some legitimate, nondiscriminatory reason' for its action. Once such a reason is provided, the plaintiff can no longer rely on the prima facie case, but may still prevail if [they] can show that the . . . determination was in fact the result of discrimination." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (quoting *McDonnell Douglas*, 411 U.S. at 802 and citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)).

The plaintiff then must show that the defendant's proffered non-discriminatory legitimate reasons for its adverse employment actions were merely a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination, and . . . upon such rejection, no additional proof of discrimination is required[.]" (original emphasis and quotation marks omitted)). The "Plaintiff retains the 'ultimate burden of persuasion' of proving that intentional discrimination, rather than the explanation offered by the employer, was the true reason for the termination." *Viola v. Philips Medical Sys. of N. Am.*, 42 F.3d 712, 717 (2d Cir. 1994) (citing *Hicks*, 509 U.S. at 511). "[The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

The Defendants argue that Ms. Bogle's disparate treatment claim against them must fail because (1) Ms. Bogle cannot support a prima facie case of discrimination, (2) DMHAS had a

legitimate reason to fire Ms. Bogle for engaging in prohibited physical contact with a patient, and (3) Ms. Bogle cannot demonstrate that firing Ms. Bogle for prohibited contact was a pretext for racial discrimination. *See* Mem. at 5.

In response, Ms. Bogle argues that the investigation that led to her termination was unfairly conducted, and her termination was a discriminatory result given the lesser discipline given to other non-African American employees for similar conduct. *See* Opp'n at 12–20.

In reply, the Defendants argue that Ms. Bogle "has not proffered any admissible evidence that the investigation into [her] conduct was motivated by [her] race," Reply at 7, and her comparator evidence "supports the Defendant's [sic] arguments that [Ms. Bogle] was not subjected to racial discrimination[,]" instead of denying them. Reply at 10–11.

The Court disagrees.

On this record, there is a genuine issue of material fact that Ms. Bogle has satisfied three of the four parts of the *McDonnel Douglas* test because of her (1) membership in a protected class, *see* Defs.' SMF ¶ 2 ("[Ms. Bogle] identifies as African American of race and black of color"); (2) qualifications for the position of MHA-1,[2] and (3) having suffered an adverse employment action, *see* Defs.' SMF ¶ 43 ("On or about December 10, 2020 [Ms. Bogle] was terminated from DMHAS . . . ."). To establish a prima facie case, however, Ms. Bogle must also show that "the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz*, 609 F.3d at 491–92 (citation omitted).

Ms. Bogle must provide a genuine issue of material fact as to comparators of different races, who engaged in sufficiently similar kinds of physical altercations with patients, and were

---

[2] Neither Ms. Bogle nor the Defendants dispute that Ms. Bogle was qualified for this position. *See generally* Defs.' SMF; Pl.'s SOF; *see also Dufort*, 874 F.3d at 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'").

treated better, in order to raise an inference of discrimination to support her prima facie case.[3]

*See Graham v. Long Island R.R.*, 230 F.3d 34, 42 (2d Cir. 2000) ("[T]o be similarly situated, [the

plaintiff and comparators] must have been subject to the same disciplinary standards and have

engaged in conduct of comparable seriousness"); *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 495

(2d Cir. 2010) ("Because [the plaintiff] has not identified a similarly-situated employee who

faced equally serious allegations and whom [the employer] allowed to remain on the job, [the

plaintiff] has failed to raise an inference of discrimination."); *cf. Radwan*, 55 F.4th at 138

("[A]lthough a comparator must be similarly situated to Radwan in material respects, as

discussed above, they need not be identically situated."); *see, e.g., Lee v. Grocery Haulers Inc.*,

No. 3:20CV523 (JBA), 2022 WL 743087, at *6 (D. Conn. Mar. 11, 2022) ("Alternatively,

Plaintiff asserts that both he and Mr. Bocca were accused of threatening conduct: Plaintiff was

accused of having threatened to 'kick [Mr. Bocca's] ass,' while Plaintiff accuses Mr. Bocca of

---

[3] Ms. Bogle notes that the Connecticut Commission on Human Rights and Opportunities ("CHRO") "rendered a Reasonable Cause Finding on the behalf of [her]." Opp'n at 22. The CHRO found that "the Complainant was given different terms and conditions of employment and disparately discharged due to discrimination because of her race (African American) and color (Black)." CHRO Final Finding of Reasonable Cause, Exhibit O to Opp'n, ECF No. 60-17 at 6 (Jan 10, 2025) ("CHRO Findings"). The basis for this finding appears to be that all employees in Ms. Bogle's position as an MHA-1, who had been attacked by patients and dismissed for patient abuse were African American/Black. *See id.* And, "there were no White employees discharge for defending themselves from aggressive residents," *id.* rather, "White employees were only discharged when acting as aggressors and/or causing physical injury to residents." *Id.* at 6. But these findings are not corroborated by the record before the Court. First, while the CHRO findings state that four Black MHA-1s were dismissed for patient abuse after being attacked by patients, in this record, the only Black MHA-1 who was dismissed for patient abuse after being attacked by patients is Ms. Bogle. Mr. Anton Butler was not dismissed, but rather given a 30-day suspension for getting into a physical altercation after ""obstruct[ed] the desired means of egress that the Patient has elected to take," Eric Seitz and Anton Butler Investigation Summary, Exhibit H to Opp'n, ECF No. 60-10 at 6 (Jan. 10, 2025) ("Eric Seitz and Anton Butler Investigation Summary"). *See* Deposition Transcript of Michael Wood, Exhibit B to Opp'n, ECF No. 60-4 at 108:4–9 ("Deposition Transcript of Michael Wood") ("A. The recommendations was for suspensions of 15 day each. But after the review, it was 15 days for Eric Seitz and 30 days for Mr. Butler. Q. So Mr. Seitz got 15 days suspension and Mr. Butler got 30? A. As a result of the Review Committee."). And the only other Black MHA-1 detailed in the record for an investigation into patient abuse was not attacked by a patient but was the aggressor. *See infra* note 5. This record thus lacks the admissible evidence necessary to create the genuine issues of material fact suggested by the CHRO findings. *See* Fed. R. Civ. P. 56 ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [this court] like the district court in awarding summary judgment, may rely only on admissible evidence." (internal quotation marks omitted)).

threatening that he would come to Plaintiff's office and 'say what he wanted to [Plaintiff's] face.' These instances cannot be viewed as of 'comparable seriousness.' Plaintiff is accused of threatening to engage in a violent act, while Mr. Bocca is only accused of threatening to verbally confront Plaintiff in person. The record does not support Plaintiff's theory that Mr. Bocca and Plaintiff are 'similarly situated in all material respects,' and as such, Plaintiff cannot rely on disparate treatment to support an inference of discrimination." (internal citations omitted)), *aff'd*, No. 22-680, 2023 WL 8253089 (2d Cir. Nov. 29, 2023).

Ms. Bogle points to three different comparators, Jason DeMarco, Steven Petrucci, and Erik Seitz, *see* Opp'n at 18–20. As to the latter two, neither Steven Petrucci nor Erik Seitz, had an incident with a patient involving the physical harm of a patient. *See* Defs.' SMF ¶ 87 ("Petrucci was accused of verbally abusing a patient - he swore at a patient.");[4] Defs.' SMF ¶ 82 ("Erik Seitz (Caucasian) received a fifteen-day suspension because his participation in [another] incident had one component: he blocked the means of egress for the patient. He told a patient who was trying to leave the break room to go around. Seitz received a fifteen-day suspension for that communication with the patient."). Thus, neither can serve as a valid comparator, for the purpose of "giving rise to the inference of discrimination."

As to the final comparator, Mr. DeMarco apparently used "excessive physical force as the intervention, resulting in [the patient] suffering serious facial injuries," Jason DeMarco Investigation File, Exhibit V to Mem., ECF No. 60-24 at 7 (Jan. 10, 2025) ("Jason DeMarco Investigation File"), even though the patient was arguably the aggressor from the accounts of Mr.

---

[4] While Ms. Bogle denies that "Petrucci's work history of being the subject of three previous patient abuse investigations was apparently taken into account when he was issued an exceedingly minor level of discipline," Plaintiff's Responses to Defendant's Statement of Undisputed Facts, ECF No. 61 at 6–7 ¶¶85–87 (Jan. 10, 2025), her admission of other facts is most relevant at this stage of the case. *See Anderson*, 477 U.S. at 248 ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.")

DeMarco and eyewitnesses. *See id.* at 3 ("Jason said [the patient] walked towards him. [The patient] walked between him and the TV and said to Jason a couple of times, ' . . . I'm gonna kill you.' Jason backed away towards the nurse's desk keeping his back to the counter of the desk. Jason said [the patient] was taking off his coat, his headphones and walkman. Jason said he told [the patient], 'Calm down, I don't know why you are mad at me.' Jason said his back was close to then counter at this time. Jason said [the patient] came at him and stopped about 4 feet from Jason, finished taking his coat and headphones off, and threw them down.").

Just like Ms. Bogle, Defendants terminated Jason DeMarco, a white male, for physically harming a patient in violation of DMHAS Work Rule #19. *See* Opp'n at 18 ("Jason DeMarco ('DeMarco'), a mental health assistant who is Caucasian of race was accused of patient abuse and a violation of Work Rule No. 19. DeMarco, who worked at CVH in what was known as Merritt 3-E, was involved with restraining a mental health patient which resulted in the patient sustaining a broken nose, as well as dislodged tooth.") (citing Bogle's Deposition Transcript, Exhibit A to Opp'n, ECF No. 60-2 at 32:25–34:24 (Jan. 10, 2025) ("Bogle Deposition Transcript"), and Jason DeMarco Investigation File).

As to Mr. DeMarco, Ms. Bogle points out that, despite his physical interaction with a patient, Mr. DeMarco had been reinstated and then dismissed again, Opp'n at 18 ("Although DeMarco was initially terminated by DMHAS, he was reinstated through the collective bargaining grievance process. Then, DeMarco was involved in yet another hospital-wide investigation at the Whiting Forensic facility of CVH, which uncovered ongoing, continuous, and wide-spread abuse of patients. As a result, DeMarco, who at that point had a documented history of patient abuse, was once again, dismissed from state service."). While the Defendants suggest that the circumstances around DeMarco's initial firing, reinstatement, and subsequent

firing do not give rise to an inference of discrimination between these two employees of different races, Mem. at 15 ("Thus, the Plaintiff presented no specific evidence about this [Mr. DeMarco]. Even if the Plaintiff had presented specific evidence about DeMarco's investigation and result, the fact that DeMarco was offered a Stipulated Agreement does not make him comparable to the Plaintiff because the stipulated agreement is merely the result of a particular negotiated settlement offered to DeMarco by the Office of Labor Relations. The undisputed facts establish that DeMarco and the Plaintiff received the same treatment." (internal citation omitted)), these factual determinations are best left for a jury, not this Court, to resolve. *See Radwan*, 55 F.4th at 138 ("Juries are well equipped to compare and weigh these differing forms of misconduct under the common disciplinary standards that applied to all student-athletes at UConn. Therefore, we reject any contention that, to survive summary judgment, Radwan was required to demonstrate that a proposed comparator committed the exact same misconduct as she did or to present an identical factual analog to her situation."). Indeed, in *Radwan*, "the district court erred in not allowing the jury to decide whether the circumstances surrounding the misconduct of male student-athletes at UConn were sufficiently similar to Radwan, such that the jury could infer that the more favorable treatment of the male student-athletes was evidence of gender discrimination under Title IX." *Id.* at 139.

Significantly, on this record, there are genuine issues of material fact—facts best left for a jury to resolve—as to whether Ms. Bogle aggressively attacked a patient at all, as Mr. DeMarco did, or simply did just enough to protect herself from a patient attack. *Compare* Police Case Incident Report, Exhibit Q to Opp'n, ECF No. 60-19 at 2 ("Police Case Incident Report") ("You can clearly see that Bogle raises her arms to avoid being struck by [a patient] and they begin to struggle with one another. You can see [a patient] exit his room, which is behind were [sic]

Bogle is struggling to get away from [a patient]. You can see [a patient] from behind, grab ahold of Bogle's sweatshirt, struggle with her briefly and then it appears [a patient] pushes Bogle. You then see both Bogle and [a patient] lose balance and fall to the floor. At this point Bogle is able to return to her feet and run out of the male dorm for help."), *with* Melissa Bogle Investigation Summary, Exhibit F to Opp'n, ECF No. 60-8 at 2 ("Melissa Bogle Investigation Summary") ("MHA Bogle grabbed the patient by the sweat shirt and pulled the patient to the floor forcefully. MHA Bogle left the patient on the floor and walked away."). Indeed, the account of the public security personnel as to what happened is not mentioned at all in the investigative summary, in contrast to the investigative summaries of others. *Compare* Melissa Bogle Investigation Summary (failing to mention account of public security personnel), *with* Jason DeMarco Investigation File at 7 (mentioning that the investigator "spoke with Captain Robert Bongiorno" of the "CVH Campus Police"). As a result, the resolution as to whether the treatment of Mr. DeMarco was comparable to Ms. Bogle, and gives rise to an inference of discrimination will be left for a jury to determine. *See Radwan*, 55 F.4th at 133 ("[T]hese factual disputes collectively preclude summary judgment, and the weighing of the evidence (including the competing reasonable inferences that could be drawn from such evidence) must be resolved by a jury in this case.").

For similar reasons, once the burden shifts to the Defendants to raise a legitimate nondiscriminatory reason for Ms. Bogle's termination, genuine issues of material fact remain for a jury to determine. Here, Defendants point to Ms. Bogle's alleged violation of DMHAS' policies. *See* Defs.' SMF ¶¶ 72–74; *see also Terpstra v. Shoprite Supermarket, Inc.*, No. 17-CV-6840 (KMK), 2019 WL 3338267, at *6 (S.D.N.Y. July 25, 2019) (finding that evidence of violations of company policies is "is sufficient to satisfy Defendant's burden to proffer a

legitimate reason for Plaintiff's termination") (citing *Russell v. Aid to Developmentally Disabled, Inc.*, 753 F. App'x 9, 13 (2d Cir. 2018) ("[The plaintiff] was terminated in part for violating [the employer's] attendance policy . . . . Applying [the employer's] neutral attendance policy is 'a neutral reason for the complained of action.'") (citing *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) ("With respect to a discrimination claim, 'once the [employer] has made a showing of a neutral reason for the complained of action, to defeat summary judgment . . . the [employee's] admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [employer's] employment decision was more likely than not based in whole or in part on discrimination.'"))).

Ms. Bogle thus must raise a genuine issue of material fact that the Defendants' legitimate reasons for termination were just pretext for discrimination. *See Tu Ying Chen v. Suffolk Cnty. Cmty. Coll.*, 734 F. App'x 773, 776 (2d Cir. 2018) ("Even if Defendants deviated procedurally in some way, none of those deviations reasonably affected their decision or raise the specter of a discriminatory pretext.") (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 45 (2d Cir. 2000) ("There is, however, no evidence that Weinstock's sex played a role in any alleged procedural irregularities, and there is, again, no evidence of pretext. It is true that departures from procedural regularity can raise a question as to the good faith of the process where the departure may reasonably affect the decision. In this case, however, whatever irregularities existed did not affect the final decision to deny Weinstock tenure." (internal citations and quotation marks omitted))); *see, e.g.*, *Bunting v. Kellogg's Corp.*, No. 3:14-CV-00621, 2016 WL 5799291, at *6 (D. Conn. Sept. 30, 2016) (holding that "the procedural irregularities must themselves contribute to the implication of discrimination in order for the plaintiff to survive summary judgment" and even if plaintiff could show such procedural irregularities, "a reasonable jury could not, without

further evidence, infer that [the employer's decision to deviate from its procedures was] motivated by [plaintiff's race]").

Ms. Bogle points to irregularities in the investigation of her alleged policy violations as a pretext for discrimination, specifically allegations of evidence that was not reviewed or considered, opinions of other employees not taken into account, and no application of progressive discipline. *See* Pl.'s SOF ¶¶ 32–96. While the Defendants argue that none of these alleged irregularities undermine its ultimate decision of termination, or suggest pretext, Reply at 8 ("Assuming arguendo that the investigation did not follow the normal process, nothing about the investigation suggests that the investigation was done for discriminatory reasons, and in the absence of such evidence, procedural irregularities on their own do not suffice to show an inference of discrimination."), as noted above, and as recognized by the Second Circuit recently in *Radwan*, "as with the comparator evidence, these fact-specific issues cannot be resolved on summary judgment based on the record in this case." *Radwan*, 55 F.4th at 140 (citations omitted); *cf. id.* ("UConn counters that none of the purported inconsistencies or alleged procedural issues (which UConn disputes) undermine its determination that Radwan engaged in serious misconduct, nor do they demonstrate that any of the reasons offered for her scholarship termination – including that her conduct required UConn to issue a formal apology and that she was the only UConn student to ever receive a reprimand from the AAC – was pretextual.")

Accordingly, summary judgment will be denied as to Ms. Bogle's disparate treatment claim.

### B.  The Hostile Work Environment Claim Against DMHAS

Title VII's prohibition with respect to "[t]he phrase terms, conditions, or privileges of employment evinces a congressional intent to strike at the entire spectrum of disparate treatment

. . . , which includes requiring people to work in a discriminatorily hostile or abusive environment." *Littlejohn v. City of New York*, 795 F.3d 297, 320 (2d Cir. 2015) (internal quotation marks and citation omitted). To establish a Title VII hostile work environment claim, "a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Additionally, a "plaintiff must demonstrate a specific basis for imputing the conduct creating the hostile work environment to the employer." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (citing *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)). A plaintiff may do so by establishing a "supervisor's harassment of a supervised employee" or that "the employer 'failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'" *Blue v. City of Hartford*, No. 3:18-CV-974 (CSH), 2019 WL 7882565, at *13 (D. Conn. Oct. 22, 2019) (quoting *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009)).

"In determining whether a plaintiff suffered a hostile work environment, [courts] must consider the totality of the circumstances." *Littlejohn*, 795 F.3d at 321. A court ruling on a motion for summary judgment "may not properly focus on individual strands of evidence and consider the record in piecemeal fashion; rather, it must consider all of the evidence in the record, reviewing the record taken as a whole." *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012) (internal citations and quotation marks omitted). "[W]hen the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of

conduct is relevant to a hostile work environment claim." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020).

The Defendants argue that the alleged unfair investigation into Ms. Bogle and understaffing in Ms. Bogle's unit do not make out a hostile work environment claim because they are not based on Ms. Bogle's race nor were they severe and pervasive enough to rise to the level of a hostile work environment. Mem. at 23. The Defendants also argue that the hostile work environment claim cannot be imputed onto DMHAS because "DMHAS performed the investigation as a part of its normal business practice investigating cases involving patient abuse." *Id.*

In response, Ms. Bogle argues that "[c]oupled with staffing shortages which inevitably led to Bogle being physically attacked in the workplace, and the overarching ambiguity of the policy of 'Flee, Freeze or Fight' being discriminatorily ignored by the Defendant and its agents, the slipshod investigation conducted by Wood at the heavy-handed direction of Beaupre substantially altered the conditions of Plaintiff's employment, resulting in her termination. In viewing all of the circumstances in totality, as this Court is required to do, the manner in which the investigation was conducted and its outcome could lead a reasonable fact-finder to conclude that a hostile work environment existed at CVH." Opp'n at 23–24. Moreover, Ms. Bogle argues that "the very type of patient abuse investigations of which she fell victim, establishes a pattern of targeting African Americans for termination [as] Sean Stanley, who is African American and worked with [her], was also terminated on the same day for essentially yelling at a patient." *Id.* at 24–25.

In reply, the Defendants argue that "[Ms. Bogle] has not presented any admissible evidence indicating that the staff shortages and unsafe conditions were a result of her race," and

that "if we take [Ms. Bogle's] assertions as true, it actually supports the Defendants' position that she was not subjected to a hostile work environment because all staffers at CVH would be affected by the alleged staff shortage and unsafe working environment, regardless of race." Mem. at 11–12.

The Court agrees.

While "a work environment's hostility should be assessed based on the 'totality of the circumstances,'" *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007), "[i]t is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002). Thus, a plaintiff bringing a proper hostile work environment claim "must also demonstrate that she was subjected to the hostility because of her membership in a protected class." *Brennan v. Metro. Opera Ass'n Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).

Ms. Bogle's assertions of staffing shortages, ambiguity of DMHAS's policies regarding responses during a patient outburst, and a poorly-run investigation into her alleged policy violations could qualify as facially-neutral mistreatment rising to such severity and pervasiveness to alter her employment and give rise to a hostile work environment claim, however "mistreatment at work . . . through subjection to a hostile environment . . . is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). In raising these issues, Ms. Bogle does not assert that any of them occurred because of her race, except to reference yet again that African Americans at DMHAS were unfairly targeted for termination, evidence probative of the circumstances of her termination, but not necessarily of the hostile work environment itself.[5] *See*

---

[5] In support of her hostile work environment claim, Ms. Bogle brings up a new comparator, Sean Stanley, an African

Opp'n at 23 ("Coupled with staffing shortages which inevitably led to Bogle being physically attacked in the workplace, and the overarching ambiguity of the policy of 'Flee, Freeze or Fight' being discriminatorily ignored by the Defendant and its agents, the slipshod investigation conducted by Wood at the heavy-handed direction of Beaupre substantially altered the conditions of Plaintiff's employment, resulting in her termination."); *id.* at 24 ("Plaintiff has asserted that the very type of patient abuse investigations of which she fell victim, establishes a pattern of targeting African Americans for termination.").

"[A]n offensive work environment does not constitute a hostile work environment in the statutory sense unless the offensiveness is discriminatorily inflicted on members of a protected group of which plaintiff is a member." *Leizerovici v. HASC Ctr., Inc.*, No. 17-CV-3605 (BMC), 2018 WL 1114703, at *8 (E.D.N.Y. Feb. 27, 2018) (internal quotation mark omitted) (citing *Nicolosi-Russo v. Program Brokerage Corp.*, No. 05 CIV. 9373, 2006 WL 3690654, at *3 (S.D.N.Y. Dec. 13, 2006)); *see also McMahon v. Tompkins Cnty., New York*, No. 5:16-CV-922, 2017 WL 4443884, at *10 (N.D.N.Y. Oct. 4, 2017) ("Merely pleading a series of generally unpleasant, undesirable, or even harmful behavior is insufficient; rather, a plaintiff must plausibly allege that the hostile work environment at issue was created because of one or more of protected characteristics.") (citing *Robinson v. Harvard Prot. Servs.*, 495 Fed. Appx. 140, 141 (2d Cir. 2012) (summary order) ("To state a hostile work environment claim, a plaintiff must plead facts tending to show that the complained of conduct: . . . creates such a [hostile]

---

American that Ms. Bogle states was terminated for "essentially yelling at a patient." Opp'n at 24–25 (citing Sean Stanley Investigation Summary, Exhibit X to Opp'n, ECF No. 60-26 (Jan. 10, 2025) ("Investigation Summary of Sean Stanley")). But, when looking at the investigation summary of Sean Stanley that Ms. Bogle cites, Mr. Stanley did not just "yell" at the patient, but also got into a physical altercation with the patient: "The Patient indicated to the Patient Advocate that Mr. Stanley grabbed the Patient by the collar and told the Patient not to touch staff. The Patient is credible." Investigation Summary of Sean Stanley at 3. Because Mr. Stanley was terminated after allegedly physically touching a patient, this discipline is in line with both Ms. Bogle and Mr. DeMarco's terminations rising out of physical altercations with patients and is not evidence giving rise to an inference of discrimination. *Compare* Investigation Summary of Sean Stanley, *with supra* at 15–18.

environment because of the plaintiff's sex, or another protected characteristic." (internal quotation marks omitted) (quoting *Patane*, 508 F.3d at 113)).

Without evidence supporting that these allegations of mistreatment were due to her race, Ms. Bogle fails to create a genuine issue of material fact in support of her hostile work environment claim. *See, e.g.*, *Rys v. Davis*, No. 22-CV-10758 (KMK), 2025 WL 896844, at *10 (S.D.N.Y. Mar. 24, 2025) ("Simply put, even assuming that Plaintiff had demonstrated that the alleged failure to assign her a partner, the alleged disproportionate workload, or the alleged deviation from policy was objectively and subjectively hostile, she has failed to carry her burden in showing that any instance of hostility was related to Plaintiff's being Caucasian. Accordingly, Defendants are entitled to summary judgment on this claim."); *Blake v. Developmental Servs.*, 278 F. Supp. 3d 519, 535 (D. Conn. 2017) ("Similarly Plaintiff's unsatisfactory evaluation . . . , the written warning issued to her for removing confidential information about a client, and the memorandum from Michele Crapo regarding signing the in-service sheets cannot constitute evidence of a hostile work environment absent any evidence that these incidents were related to her race and/or color to rebut the evidence that they were in response to Plaintiff's misconduct."), *aff'd sub nom. Blake v. Dep't of Developmental Servs.*, 750 F. App'x 54 (2d Cir. 2019); *cf. Cherry v. N.Y. City Hous. Auth.*, 564 F. Supp. 3d 140, 184 (E.D.N.Y. 2021) (holding triable issue of fact existed as to hostile work environment when "Plaintiff testified that [his supervisor] assigned him a disproportionately heavy workload and required Plaintiff to work overtime hours to complete the work while denying overtime compensation because he was a man").

Accordingly, summary judgment will be granted as to Ms. Bogle's hostile work environment claim.

### C. The Section 1983 Claim Against Ms. Hyatt

The Equal Protection Clause of the Fourteenth Amendment protects public employees from race discrimination and retaliation for complaining about race discrimination. *See Vega v. Hempstead Union Free Sch. Dist*, 801 F.3d 72, 82 (2d Cir. 2015). Public employees may bring discrimination and retaliation claims under 42 U.S.C. § 1983 against "responsible persons acting under color of state law." *Id.* at 87. Any state employee "acting in [their] official capacity" acts "under color of state law." *Id.* at 88 (internal quotation marks omitted). An individual may only be held liable under Section 1983 "if that individual is personally involved in the alleged deprivation." *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) (internal quotation marks omitted).

"Such § 1983 discrimination claims parallel Title VII discrimination claims in many respects." *Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019). "The basic elements of such claims, whether pursued under Title VII or § 1983, are similar . . . ." *Id.* And to prove a disparate treatment claim, there must be plausible allegations that any "adverse employment action" occurred on account of one's race. *See id.* (using the words related to sex discrimination rather than race discrimination).

But for § 1983 claims, first, a plaintiff must allege that "the alleged deprivation was committed by a person acting under color of state law." *Id.* Second, rather than just "against the employing entity, a § 1983 claim 'can be brought against an[y] individual' responsible for the discrimination." *Id.* Third, the defendant must have "personally violated a plaintiff's constitutional rights . . . ." *Id.* Fourth, and finally, "a plaintiff pursuing a claim for employment discrimination under § 1983 rather than Title VII must establish that the defendant's

discriminatory intent was a 'but-for' cause of the adverse employment action or the hostile environment." *Id.* at 214.

The Defendants argue that: (1) Ms. Bogle has "has not set forth any evidence that Defendant Hyatt's own conduct was discriminatory or that her own conduct created an alleged hostile work environment," Mem. at 25, (2) Ms. Bogle "has not presented any evidence that Defendant Hyatt's own conduct was the but-for cause of the alleged hostile work environment," *id.*, and (3) "there's no evidence in the record to establish that Defendant, Hyatt intentionally discriminated against" Ms. Bogle. *Id.* at 27.

In response, Ms. Bogle argues that (1) Ms. Hyatt was not briefed before Labor Relations was involved in the alleged patient abuse investigation, Opp'n at 26, (2) no clinical analysis was done with respect to staffing levels during the incident, *id.*, (3) Ms. Hyatt terminated Ms. Bogle's employment even though she testified that "fighting is permitted as a standard for CVH employees to protect themselves," *id.*, and (4) Ms. Hyatt "was well aware of the discriminatory manner in which patient abuse investigations were being conducted at CVH," however she "did absolutely nothing to correct this illegal pattern of imposing harsher discipline on African American employees in general, and [Ms. Bogle] in particular." Opp'n at 27.

In reply, the Defendants argue that (1) Ms. Hyatt said that she was "not familiar with training [employees] to fight to defend themselves," Reply at 13–14, (2) "the facts asserted by [Ms. Bogle] do not show that Hyatt's own conduct created a hostile work environment, nor does it show that Hyatt's own conduct was the but-for cause of the alleged hostile work environment," *id.* at 14, and (3) "the lack of Hyatt's briefing on the matter, staffing shortage, and knowledge of alleged discriminatory investigations that imposed harsher discipline on African Americans do not establish intentional discrimination on the part of Defendant Hyatt." *Id.* at 14.

The Court disagrees.

As mentioned above, "liability for an Equal Protection Clause violation under § 1983 requires personal involvement by a defendant, who must act with discriminatory purpose. Purposeful discrimination requires more than intent as volition or intent as awareness of consequences. It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group." *Reynolds v. Barrett*, 685 F.3d 193, 204 (2d Cir. 2012) (internal quotation marks and citations omitted) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

Here, there is no question as to Ms. Hyatt's personal involvement with respect to Ms. Bogle's termination: she issued the termination letter. December 10, 2020, Letter from Lakisha Hyatt, Chief Executive Officer, CVH, to Melissa Bogle, Exhibit G to Opp'n, ECF No. 60-9 at 2 ("Hyatt Letter") ("This letter is to notify you that you are being dismissed from State service for just cause in accordance with the District 1199 contract and Section 5-240-1a of the State Personnel Regulations."); *see, e.g.*, *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (stating that personal involvement means "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts" (citation omitted)); *cf. Saez v. Lettieri*, No. 3:21-CV-00915 (VAB), 2025 WL 969545, at *10 (D. Conn. Mar. 31, 2025) ("In the absence of any admissible evidence that Chief Judicial Marshal Lettieri had any involvement in the [alleged discriminatory conduct], Mr. Saez has failed to create a genuine issue of material fact as to this issue . . . . As a result, there is no viable equal protection claim[.]").

As to whether there is a genuine issue of material fact as to whether Ms. Hyatt participated in a discriminatory act, for the same reasons discussed above, there is a genuine

issue of material fact as to whether the Defendants' legitimate reasons for termination were just pretext for discrimination *See Kirkland v. Cablevision Sys.*, 760 F.3d 223, 227 (2d Cir. 2014) (vacating a grant of summary judgment when "[t]he record contains enough evidence that, if credited, could support a jury's finding that [the defendant's] rationale for [the plaintiff's] treatment and eventual termination was a pretext for illegal race discrimination and retaliation")

Having determined that there is a genuine issue of material fact as to Ms. Bogle's Section 1983 claim against Ms. Hyatt, the only remaining issue is whether qualified immunity otherwise provides a basis for this claim's dismissal.

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). The first prong addresses "whether the plaintiff has alleged a violation of federally protected rights 'at all.'" *Naumovski v. Norris*, 934 F.3d 200, 211 (2d Cir. 2019) (quoting *Kelsey v. Cty. of Schoharie*, 567 F.3d 54, 61 (2d Cir. 2009)) (internal quotation marks omitted). The second prong asks "whether the right in question was clearly established at the time of the violation." *Tolan*, 572 U.S. at 656 (internal citation omitted).

More specifically, the Second Circuit has held that a state official sued in their individual capacity for damages arising out of their performance of discretionary functions is entitled to qualified immunity if they can demonstrate that: "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *See Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) (quoting *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996)).

The Defendants argue that Ms. Hyatt is entitled to qualified immunity because "[t]he Plaintiff has not shown any improper motivation by the Defendant, Hyatt, nor that her actions were subjectively unreasonable." Mem. at 29–30.

In response, Ms. Bogle argues that she "has asserted a Section 1983 and an Equal Protection Clause violation against Hyatt for her decision to terminate her[,]" Opp'n at 28, and provided enough evidence of Ms. Hyatt's awareness and involvement in the discrimination against her that since "a genuine factual dispute exists based on the evidentiary record before this Court, and the law against racial discrimination was clearly established at the time Hyatt decided to terminate the Plaintiff[,]" *id.* at 19, Ms. Hyatt should not be shielded by qualified immunity.

The Court agrees.

As to the first prong of the qualified immunity analysis, Ms. Bogle has alleged that Ms. Hyatt violated her federally protected rights under the Equal Protection Clause. *See supra* at 28–29; Amd. Compl. at ¶ 30–31 ("The Co-Defendant's [Hyatt's] decision to terminate the Plaintiff on or about December 16, 2020 was a blatant violation of her statutory rights afforded to her . . . . Plaintiff's termination was clear breach of her right to equal protection of law and was done because of her African American race and her color, which is black and as such was discriminatory.").

As to the second prong, the right to be free from racial discrimination in employment was well established at the time of Ms. Bogle's termination as it has been for decades. *See Saez v. Jud. Branch*, No. 3:21-CV-915 (JAM), 2022 WL 3369737, at *6 (D. Conn. Aug. 16, 2022) ("Such intentional race-based discrimination in the employment context violates equal protection rights that were clearly established at the time of Lettieri's alleged misconduct in July 2018.") (citing *United States v. City of New York*, 717 F.3d 72, 92 (2d Cir. 2013) (noting the "obvious

Case 3:23-cv-00323-VAB    Document 69    Filed 06/27/25    Page 31 of 32

proposition" that "a public official ... would violate Section 1981 or the Equal Protection Clause by intentionally taking adverse employment action on the basis of race" and that this "has been clear at least since 1976"), and *Griffin v. New York*, 122 F. App'x 533, 535 (2d Cir. 2004) (dismissing qualified immunity appeal because employee's right to be free from racially discriminatory imposition of a probationary period was clearly established in 2004)); *DiLegge v. Gleason*, 131 F. Supp. 2d 520, 522 (S.D.N.Y. 2001) ("The right to be free from discrimination in employment on account of race is well established, both by Title VII, and, with respect to state actors, under 42 U.S.C. § 1983[.]"); *Rogers v. City of New Britain*, 189 F. Supp. 3d 345, 359 (D. Conn. 2016) ("The right under Title VII and Equal Protection to be free from racial discrimination and abuse in the work place was clearly established long before the events at issue."); *see also Jemmott v. Coughlin*, 85 F.3d 61, 67-68 (2d Cir. 1996) (holding that when it is alleged that "supervisors of the harassment to which [the employee] was subjected, [] failed to reasonably investigate or address his allegations[, I]f such nonresponsiveness is shown to lead to an environment in which discrimination is an 'accepted custom or practice' of an employer, it violates an employee's clearly established right to work in an environment free of race-based invidious discrimination").

Because it has been clearly established that employees have the right to be free from racial discrimination in employment, and as stated above, there are genuine issues of material fact regarding whether the legitimate reasons that made Ms. Hyatt approve Bogle's termination were merely a pretext for discrimination, *see supra* at 10–20, the Court will deny summary judgment on the basis of qualified immunity. *See Johnson v. Ganim*, 342 F.3d 105, 117 (2d Cir. 2003) ("Where a factual issue exists on the issue of motive or intent, a defendant's motion for summary judgment on the basis of qualified immunity must fail."); *Frierson v. Reinisch*, 806 F.

31

App'x 54, 60 (2d Cir. 2020) ("[W]here a specific illegal intent is an element of the plaintiff's claim, factual disputes over whether the defendant acted with that intent will preclude the district court from granting qualified immunity at the summary judgment stage."); *see, e.g.*, *Green v. Riffo*, No. 3:18CV00960(SALM), 2022 WL 94224, at *8 (D. Conn. Jan. 10, 2022) ("A genuine issue of material fact exists as to whether Downey terminated plaintiff from his job based on false statements or retaliation, and whether the proffered legitimate reasons for the termination were objectively reasonable. On the facts presented, 'a rational jury could find that the [discipline] was imposed in retaliation' for plaintiff's November 28, 2017, complaint against Downey in the Inmate Request Form. Thus, summary judgment is precluded.") (citing *Frierson v. Reinisch*, 806 F. App'x 54, 57 (2d Cir. 2020)); *Everson v. Lantz*, 453 F. Supp. 2d 578, 584 (D. Conn. 2006) ("Because there are genuine issues of material fact going to whether defendants treated plaintiff differently than similarly situated Caucasian and Hispanic employees, I cannot determine at this stage whether defendants are entitled to qualified immunity.").

Accordingly, summary judgment on Ms. Bogle's equal protection claim against Ms. Hyatt will be denied.

## IV.    CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is **GRANTED** in part, and **DENIED** in part**.**

The hostile work environment claim is dismissed, but the Title VII disparate impact claim against DMHAS, and the Section 1983 claim against Ms. Hyatt will proceed to trial.

**SO ORDERED** at New Haven, Connecticut, this 27th day of June, 2025.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE